NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FEB 28 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

ANDREA BORDEAUX,

        Plaintiff - Appellant,

  v.

LIONS GATE ENTERTAINMENT, INC.,
a Delaware Corporation; WORLD
PRODUCTIONS, INC., a New York
Corporation,

        Defendants – Appellees.

No. 23-4340

D.C. No.
2:22-cv-04244-SVW-PLA

MEMORANDUM[*]

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted December 4, 2024
Pasadena, California

Before: OWENS, LEE, and KOH, Circuit Judges.
Dissent by Judge LEE.

    Plaintiff-Appellant Andrea Bordeaux appeals the district court's grant of

summary judgment in favor of Defendants-Appellees Lions Gate Entertainment,

Inc. and World Productions, Inc. ("WPI") on Bordeaux's claim of religious

---

    [*]    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

discrimination in violation of Title VII of the Civil Rights Act of 1964. We have jurisdiction under 28 U.S.C. § 1291. As the parties are familiar with the facts, we do not recount them here. Reviewing the district court's grant of summary judgment de novo, *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008), we affirm.

Title VII requires that an employer "reasonably accommodate" an employee's religious observance or practice unless the employer demonstrates that accommodation would result in "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Groff v. DeJoy*, 600 U.S. 447, 458 (2023). A religious accommodation poses an "undue hardship" when the accommodation "would result in substantial increased costs in relation to the conduct of [the employer's] particular business." *Groff*, 600 U.S. at 470. The undue hardship inquiry "takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 470-71 (cleaned up).

Here, WPI's "particular business" was the production of Season 2 of *Run the World*, which was scheduled to film in New York City over a ten-week period between March and May 2022.[1] In accordance with its return to work agreements with relevant industry unions and then-applicable federal, state, and local health

---

[1] The relevant employer for Bordeaux's Title VII claim is WPI. Bordeaux concedes that she sued Lions Gate Entertainment, Inc. in error.

guidelines, WPI required certain employees that needed to be physically present for filming, including Bordeaux, to be vaccinated against COVID-19. Bordeaux's requested accommodation was a blanket exemption from this vaccination requirement.

However, Bordeaux does not dispute that if she were permitted to work on the production while unvaccinated and she came into "close contact" with *any* individual testing positive for COVID-19,[2] the applicable COVID-19 protocols would require a ten-day production shutdown.[3] Bordeaux also does not dispute that

---

[2] The dissent claims that these protocols "applied only '[i]f an *employee* test[ed] positive for COVID-19.'" Dissent at 3. However, on summary judgment, Bordeaux did not dispute that the "Season 2 Protocols required unvaccinated employees who came into close contact with a person testing positive for COVID-19 to quarantine for a minimum of five days and remain fully masked for an additional five days." On appeal, Bordeaux has made no argument to suggest that these protocols were limited to close contacts on set. Pursuant to party presentation principles, we do not contradict the parties' framing of this issue. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

[3] The dissent asserts that "WPI had wide discretion to relax these requirements and avoid a potential shutdown." Dissent at 2. On appeal, however, Bordeaux has not argued that WPI could have changed its shutdown protocol. At oral argument, Bordeaux's counsel reiterated that the shutdown protocols were "union rules" and confirmed that Bordeaux did not request that WPI relax its shutdown protocols or ask WPI to request any exemptions from its union agreements. To be sure, where an employee's requested accommodation would cause undue hardship, employers must consider alternative accommodations. *Groff*, 600 U.S. at 473. Here, the record shows that WPI *did* consider multiple alternatives, including masking, testing, and reclassifying Bordeaux's work zone. Even if WPI did have discretion to relax the production's shutdown rules, this alternative was unworkable because it would have presented a separate undue hardship: an increased health and safety

a ten-day production shutdown would have cost WPI an estimated $1.5 to $3.0 million. Moreover, Bordeaux does not dispute that multiple shutdowns over the ten-week filming schedule could result in a permanent shutdown of Season 2's production.

Looking at these "practical impact[s]" of a production shutdown, especially considering the ten-week filming schedule and the production's budget, the burden of Bordeaux's requested accommodation "rise[s] to an 'excessive' or 'unjustifiable' level'" and constitutes an undue hardship under Title VII. *Groff*, 600 U.S. at 469. [4]

Bordeaux's sole argument on appeal is that the risk of a shutdown was too speculative to constitute an undue hardship under Title VII. However, an employer need not establish that an adverse health or safety event is *certain* to result from an accommodation to establish undue hardship under Title VII. *See Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984) (per curiam) (holding that employer had established undue hardship where employee's requested religious

---

risk for Bordeaux's coworkers. *See id.* at 472 (reaffirming that impacts on coworkers are relevant in an undue hardship analysis). WPI was not required to discuss an infeasible alternative accommodation with Bordeaux. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) ("If an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act.").

[4] Because WPI could not have granted Bordeaux's accommodation request without facing the undue hardship of a potential ten-day production shutdown, we do not reach the district court's additional independent bases for finding undue hardship.

accommodation could lead to potential toxic exposure and violations of occupational safety laws). By early 2022, New York City had emerged as an epicenter of the Omicron variant, with a seven-day rolling average of 43,846 new cases per day as of January 3, 2022. Given the prevalence of COVID-19 in New York City over the relevant time period, the risk of Bordeaux coming into "close contact" with an individual testing positive was a real, not a hypothetical, risk.

**AFFIRMED**.

*Bordeaux v. Lions Gate*, Case No. 23-4340

LEE, Circuit Judge, dissenting:

In January 2022, Andrea Bordeaux—one of the leading stars of the television show *Run the World* on the Starz! network—refused to take the COVID-19 vaccine, citing religious objections. Under Title VII of the Civil Rights Act of 1964, an employer must "reasonably accommodate" an employee's religious practice unless it would impose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Groff v. DeJoy*, 600 U.S. 447, 458 (2023). But World Productions, Inc. (WPI)—the company that produces the show—did not reasonably consider providing accommodations. Instead, it responded by firing her from Season 2 of the show. An employer, however, cannot fire an employee who refuses the COVID-19 vaccine based on religious beliefs—without at first considering alternative options. I would reverse the district court's summary judgment for WPI and remand to see if WPI could have reasonably accommodated Bordeaux's request not to be vaccinated. I thus respectfully dissent.

WPI contends that Bordeaux's decision not to take the COVID-19 vaccine imposed an "undue hardship": it might face a ten-day shutdown—five days of quarantine and five days of masking—each time she had a "close contact" with someone who tested positive for COVID-19. Its hands, it argues, were tied by a combination of labor agreements, federal guidance, and its own internal protocols.

1

But the record belies that assertion. In reality, WPI had wide discretion to relax these requirements and avoid a potential shutdown.

WPI first relies on its internal protocols for Season 2, claiming that they imposed a 10-day shutdown. But the two-page protocol required only five days of quarantine; it said nothing about further masking. In any event, WPI could have altered its own protocols and considered alternatives (*e.g.*, daily testing) to accommodate Bordeaux. But it chose not to do so.

Perhaps recognizing that it had the power to change its own internal COVID-19 protocols, WPI hitches its wagon to federal CDC guidance in claiming that it faced a 10-day shutdown in case of exposure. But the CDC guidance had been adopted only as a "guiding principle[]," and not a rule. We know CDC guidance was not mandatory for the show because WPI had enacted less stringent requirements than the prevailing CDC guidance.

WPI also maintains that it could not accommodate Bordeaux because of the requirements in the July 19, 2021 Return to Work Agreement between the studios and the unions. But the Return to Work Agreement was flexible by design: it had an "Enabling Clause" that allowed for "modifications to [its] terms and provisions . . . to be applicable only to a specific production(s)." In other words, WPI under the labor agreement could have sought accommodations to see if Bordeaux could work

2

without taking the COVID-19 vaccine—but again it refused to do so and instead fired her.

Further, the risk of a shutdown based on the Return to Work Agreement appeared speculative at the time. The agreement's shutdown rule applied only "[i]f an *employee* test[ed] positive for COVID-19 . . . ." But all the employees in the relevant production areas other than Bordeaux had agreed to be vaccinated. And in January 2022, the (mistaken) scientific belief was that a COVID-19 vaccine *prevented transmission* of the virus with an efficacy rate of over 90 percent. Put another way, the chance that Bordeaux would encounter a vaccinated employee testing positive for COVID-19 would have been minute—at least based on the (incorrect) scientific belief at the time.

The majority asserts that Bordeaux never asked for those specific accommodations. That is not the full picture. During the January 18, 2022 meeting between Bordeaux, WPI, and CTEH (its disaster-relief consultant), Bordeaux specifically asked to know what "options" had been "discussed . . . to reasonably accommodate [her]." This included whether the "return to work agreement" could be relaxed, which Bordeaux's own union had informed her could. In fact, Bordeaux and her agent asked three times whether a producer could provide the accommodation of a vaccine exemption to a performer in her position without running afoul of the Agreement's requirement that mandatory vaccination policies

3

apply universally. Each time, WPI responded—in disregard of the Return to Work Agreement—that no such accommodation was permitted. Even though it had the ability to relax the close contact protocols, WPI denied any discretion to even consider letting Bordeaux work unvaccinated in her zone. That violates the duty that employers have to try to accommodate their employees' religious objections. *See DeJoy*, 600 U.S. at 473.[1]

Given this record, I believe that a genuine issue of material fact exists whether WPI could have accommodated Bordeaux's request to work unvaccinated without a substantial risk of having to shut down production. I would remand for the district court to analyze further.

Finally, I briefly address the district court's other bases for granting summary judgment. It held that a guaranteed increased cost of $300,000 for separate make-up and support staff for Bordeaux was "substantial." But whether $300,000 to accommodate a leading actress in a major multi-million-dollar Hollywood production is a question for the jury. *See DeJoy*, 600 U.S. at 468.

---

[1] Bordeaux also did not have to ask for these specific accommodations under *DeJoy*. *DeJoy* places the onus on employers—and "the court"—to conceive of and assess the various ways the employer might "reasonably accommodate [the] employee's practice of religion" (e.g., shift swapping, incentive pay, and so on), before undue hardship can be found. *DeJoy*, 600 U.S. at 473.

4

The district court also ruled that Bordeaux's refusal to be vaccinated imposed a health risk to her colleagues. But all of her coworkers agreed to be vaccinated. And as noted earlier, the (incorrect) scientific belief in January 2022 was that the COVID-19 vaccine *prevented the transmission* of the virus in 90-plus percent of cases. In other words, the scientific community wrongly believed then that someone who was vaccinated would not be at a substantial risk of being infected. In analyzing this issue, the district court should have considered this scientific consensus at the time that WPI made its decision not to accommodate. At the very least, the district court's blanket assertion that "[a]round the time . . . Season 2 was filming, roughly 2,000 deaths per day were attributable to COVID-19" does not account for the safety measures specific to WPI's production, or the prevailing scientific belief about the vaccine's efficacy at the time.

I respectfully dissent.